UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x   Case No.:
MARQUIS WHO'S WHO VENTURES LLC,

                Plaintiff,                            **AFFIDAVIT**

   -against-

REVENUEBOOST LLC,

                Defendant.
---------------------------------------------------------------x

STATE OF NEW YORK   )
                              ) ss:
COUNTY OF NASSAU  )

**KRISTINE MCCARTHY**, being duly sworn deposes and states as follows:

1.    I am the Chief Marketing Officer of Marquis Who's Who Ventures LLC ("Marquis" or "Plaintiff"). I submit this affidavit in support of Plaintiff's application to enjoin the defendant RevenueBoost LLC ("Revboost" or "Defendant"), from using, misappropriating, and disclosing the trade secrets of Plaintiff and from continuing to infringe on Plaintiff's Marquis Who's Who trademark. I have personal knowledge of the matters herein.

## OUR COMPANY'S MARQUIS WHO'S WHO TRADEMARK

2.    Marquis is and has been engaged in the business of publishing reliable and comprehensive biographical data of renowned individuals throughout the United States since 1898.

3.    A significant portion of our business consists of publishing collections of biographical data and providing opportunities to individuals to be listed in our publications.

4.    Plaintiff is commonly known and doing business as "Marquis Who's Who" in the professional publications industry.

7953996.3

5. On or about April 18, 2006, Marquis was granted United States Trademark Registration Number 3,082,435 for the trademark "Marquis Who's Who," in International Class 035, for the following goods and services: providing an on-line database featuring biographical directories ("Marquis Who's Who Mark"). A true and correct copy of the trademark information of the Marquis Who's Who Mark and a specimen of the same, filed with the United States Patent and Trademark Office, is annexed hereto as part of **Exhibit "1"** at pages 1 through 5 thereof.

6. As part of Plaintiff's Marquis Who's Who trademark application, Plaintiff alleged that it first used the Marquis Who's Who Mark in United States commerce in or about 1954. *See id.* at p. 1.

7. Plaintiff's Marquis Who's Who Mark trademark is currently active, and Plaintiff is the owner of the Marquis Who's Who Mark, which is a valid and subsisting United States Trademark. *See id.* at p. 2.

8. On or about October 3, 1995, Marquis was granted United States Trademark Registration Number 1,923,629 for the trademark "Marquis", in International Class 016, for the following goods and services: biographical directories ("Marquis Mark"). A true and correct copy of the trademark information of the Marquis Mark and a specimen of the same, filed with the United States Patent and Trademark Office, is annexed hereto as part of **Exhibit "1"** at pages 6 through 11 thereof.

9. As part of Plaintiff's Marquis Mark trademark application, Plaintiff alleged that it first used the Marquis Mark in United States commerce on or about June 20, 1899. *See id.* at p. 6.

10. Plaintiff's Marquis Mark trademark is currently active, and Plaintiff is the owner of the Marquis Mark, which is a valid and subsisting United States Trademark. *See id.* at p. 7.

11. On or about August 20, 1974, Marquis was granted United States Trademark Registration Number 991,399 for the trademark "Who's Who", in International Class 016, for the following goods and services: publications in the nature of directories published from time to time ("Who's Who Mark"). A true and correct copy of the trademark information of the Who's Who Mark and two specimens of the same, filed with the United States Patent and Trademark Office, is annexed hereto as part of **Exhibit "1"** at pages 12 through 22 thereof.

12. As part of Plaintiff's Who's Who Mark trademark application, Plaintiff alleged that it first used the Who's Who Mark in United States commerce on or about August 31, 1970. *See id.* at p. 12.

13. Plaintiff's Who's Who Mark trademark is currently active, and Plaintiff is the owner of the Who's Who Mark, which is a valid and subsisting United States Trademark. *See id.* at p. 13.

14. On or about May 17, 1949, Marquis was granted United States Trademark Registration Number 509,921 for the trademark "Who Was Who in America", in International Class 016, for the following goods and services: publication in the nature of a directory published from time to time ("Who Was Who Mark"). A true and correct copy of the trademark information of the Who Was Who Mark and a specimen of the same, filed with the United States Patent and Trademark Office, is annexed hereto as part of **Exhibit "1"** at pages 23 through 33 thereof.

15. As part of Plaintiff's Who Was Who Mark trademark application, Plaintiff alleged that it first used the Who Was Who Mark in United States commerce on or about February 10, 1943. *See id.* at p. 23.

16. Plaintiff's Who Was Who Mark trademark is currently active, and Plaintiff is the owner of the Who Was Who Mark, which is a valid and subsisting United States Trademark. *See id.* at p. 24.

17. On or about June 11, 1940, Marquis was granted United States Trademark Registration Number 378,389 for the trademark "Who's Who in America", in International Class 016, for the following goods and services: publications in the nature of a directory published from time to time ("Who's Who America Mark") (the Marquis Who's Who Mark, the Marquis Mark, the Who's Who Mark, the Who Was Who Mark, and the Who's Who America Mark collectively the "Marquis Who's Who Marks"). A true and correct copy of the trademark information of the Who's Who America Mark and a specimen of the same, filed with the United States Patent and Trademark Office, is annexed hereto as part of **Exhibit "1"** at pages 34 through 42 thereof.

18. As part of Plaintiff's Who's Who America Mark trademark application, Plaintiff alleged that it first used the Who's Who America Mark in United States commerce on or about June 20, 1899. *See id.* at p. 34.

19. Plaintiff's Who's Who America Mark trademark is currently active, and Plaintiff is the owner of the Who's Who America Mark, which is a valid and subsisting United States Trademark. *See id.* at p. 35.

20. Plaintiff has used and continues to use the Marquis Who's Who Marks in United States commerce to date in connection with the goods and services of providing an on-line database featuring biographical directories and publishing biographical directories.

21. As a result of its widespread, continuous, and exclusive use of the Marquis Who's Who Marks to identify its goods and services and Plaintiff as their source, Plaintiff owns valid and subsisting federal statutory and common law rights to the Marquis Who's Who Marks.

22. Plaintiff's Marquis Who's Who Marks are distinctive to both the consuming public and Plaintiff's trade.

23. Plaintiff has expended substantial time, money, and resources marketing, advertising, and promoting the goods and services sold under the Marquis Who's Who Mark including through internet and email campaigns.

24. Plaintiff retained Defendant Revboost to assist Plaintiff in its targeted email marketing, advertising, and promotional campaigns under the Marquis Who's Who Marks. In connection therewith and during the period from August, 2021 through November, 2022, Plaintiff paid Defendant Revboost the sum of almost $2,000,000.00.

25. Plaintiff, through its targeted email marketing, advertising, and promotional campaigns under the Marquis Who's Who Marks, distributes, provides, and sells its goods and services under the Marquis Who's Who Marks to clients and potential clients on the internet, which include renowned and noteworthy individuals worldwide.

26. The goods and services Plaintiff offers under the Marquis Who's Who Mark sare of high quality, as Plaintiff's on-line database featuring biographical directories contains comprehensive, reliable, and accurate information.

27. As a result of Plaintiff's expenditures and efforts, and Marquis Who's Who Marks have come to signify the high quality of the goods and services designated by the Marquis Who's Who Marks, and acquired incalculable distinction, reputation, and goodwill belonging exclusively to Plaintiff.

28. Plaintiff's Marquis Who's Who Marks and the goods and services offered thereunder have received significant unsolicited coverage in various media, including print, television, and radio publications sincePlaintiff's inception more than a century ago.

29. I am advised by my attorneys that, as a result of their distinctiveness and widespread use and promotion throughout the United States, Plaintiff's Marquis Who's Who Mark are famous trademarks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. 1125(c), and became famous prior to the acts of the Defendant Revboost alleged herein.

## PLAINTIFF'S PROPRIETARY AND CONFIDENTIAL INFORMATION AT ISSUE

30. Given the nature of Plaintiff's business, Plaintiff prizes above all the development and protection of its customer relationships, and the trust it derives therefrom, which it views as its most valuable asset. Any development that would taint or jeopardize Plaintiff's brand and how Plaintiff is perceived or valued by its customers is the single greatest risk to Plaintiff's business.

31. Given the value which Plaintiff places on the personal information of its customers, Plaintiff has particular safeguards and rules in place, designed to maintain the confidentiality of its trade secrets, among them, its email opt-out information and customer data.

32. Plaintiff does not make its email opt-out information and customer data public, in part due to the sensitive nature of the email addresses and other identification data contained therein.

33. Due to the nature of Plaintiff's industry, discretion and confidentiality of its email opt-out information and customer data is of the utmost importance to both customers and potential customers. As a result, the confidentiality of Plaintiff's email opt-out information and customer data is crucial to the continued success of Plaintiff.

34. Plaintiff has taken reasonable and significant measures to keep the information contained within its email opt-out information and customer data secret and confidential.

6

35. For example, access to the email opt-out information and customer data is restricted and all vendors with whom Plaintiff does business are required to sign a non-disclosure agreement and have individual passwords to access same.

36. Plaintiff also requires that its employees sign a confidentiality agreement upon hire and restricts access to Plaintiff's trade secrets to certain employees, each of which has their own login and password to access Plaintiff's email opt-out information and customer data.

37. Furthermore, Plaintiff provides security guidelines to its employees in an effort to protect its confidential material and trade secrets, such as password protocols and permissible internet practices.

## DEFENDANT REVBOOST'S UNLAWFUL ACTIVITIES

38. Upon information and belief, Defendant Revboost is engaged in the business of targeted email marketing.

39. In or about July 2021, Plaintiff and Defendant Revboost discussed the prospect of entering into a business relationship pursuant to which Defendant Revboost was to conduct email marketing on behalf of Plaintiff.

40. In furtherance of their discussions, on or about July 22, 2021, Plaintiff and Defendant Revboost entered into a Non-Disclosure Agreement (the "Non-Disclosure Agreement"), pursuant to which Revboost agreed to protect Plaintiff's confidential information and trade secrets. A true and correct copy of the Non-Disclosure Agreement is annexed hereto as **Exhibit "2"**.

41. Specifically, paragraph 1 of the Non-Disclosure Agreement provides as follows:

> Revenueboost LLC (hereinafter, the "Receiving Party") understanding that Marquis Who's Who Ventures, [LLC] and its subsidiaries and affiliates (hereinafter, collectively, the "Disclosing Party") has disclosed or may disclose certain proprietary and/or confidential financial information in

7

connection with a possible transaction between the Disclosing Party and the Receiving Party (the "Proposed Transaction) concerning the Disclosing Party, its business and/or products and services whether or not such information is designated or marked as "confidential", "proprietary" or otherwise (including, without limitation, profit and loss statements, balance sheets, payroll documentation, etc.) which to the extent previously, presently or subsequently disclosed to the Receiving Party is hereinafter referred to as "Confidential Information" of the Disclosing Party.
"Confidential Information" also includes the manner in which information may be combined with other information or synthesized or used by the Disclosing Party and the fact that discussions or negotiations are taking place concerning the Proposed Transaction and the terms, conditions and other facts with respect to such transaction.

*See* Ex. 2 at p. 1.

    42.    Paragraph 2 of the Non-Disclosure Agreement provides in relevant part as follows:

    (a) The Receiving Party agrees that Confidential Information of the Disclosing Party shall:
        (i) be used solely for the purpose of evaluating the Proposed Transaction, internally, and not for any other purpose whatsoever; (ii) not be copied; (iii) be kept in a safe place and the Receiving Party agrees to exercise reasonable precautions to protect such Confidential Information (including, without limitation, all precautions the Receiving Party employs with respect to its Confidential Information); and (iv) be kept confidential by the Receiving Party and the Receiving Party agrees not to divulge any such Confidential Information or any information derived therefrom to any Person…

*See id.*

    43.    Paragraph 6 of the Non-Disclosure Agreement provides as follows:

The Receiving Party acknowledges and agrees that the Confidential Information of the Disclosing Party is proprietary to and is a valuable, unique asset of the Disclosing Party and that any disclosure or use thereof in violation of the provisions of this Agreement will cause irreparable harm and loss to the Disclosing Party. As such, the Receiving Party acknowledges and agrees that it shall be responsible for its employees compliance with the provisions of the Agreement and that money damages alone are not a sufficient remedy for any breach or threatened breach of this Agreement by the Receiving Party and/or its employees and that the Disclosing Party shall be entitled to commence an action for specific performance and/or injunctive relief as remedies for any such breach or any threatened breach, and shall not be required, in any such action, to post any bond on account of any injunctive or preliminary relief sought. Such remedies shall not be deemed to be the exclusive rights or remedies for a breach of this Agreement but shall be in addition to all other

8

rights and remedies available at law, in equity or otherwise to the Disclosing Party, it being the intention that all such rights and remedies are cumulative and not exclusive.

*See id.* at p. 2.

44. In or around August 2021, Plaintiff hired Defendant Revboost to conduct an email marketing campaign on Plaintiff's behalf.

45. Despite the parties' agreement and the restrictive covenants contained therein, Defendant Revboost stole, converted, and misappropriated Plaintiff's confidential information, trade secrets, and goodwill for its own personal benefit, as detailed herein.

46. On or about October 24, 2022, through an internet article published on the website Snopes.com, Plaintiff became aware of scam emails being sent to individuals, including Plaintiff's customers, using the Marquis Who's Who Marks (the "Snopes Article"). The aforementioned article is located at https://www.snopes.com/fact-check/whos-who-scam-email/.

47. The Snopes Article detailed that the link contained in the emails referenced therein were "confirmed to be a phishing URL."

48. The following day, on October 25, 2022, Plaintiff wrote an email to Defendant Revboost regarding the Snopes Article with the subject line "Immediate Action NEEDED" and inquiring as to the origin of the IP address referenced in the Snopes Article (the "Snopes Email") A true and correct copy of the Snopes Email is annexed hereto as **Exhibit "3"**.

49. In response to the Snopes Email, Defendant Revboost confirmed the email contained in the Snopes Article was "from one of [Revboost's] email partners" and "rest assured there is no phishing or scam emails coming through." *See* Ex. 3.

50. Upon further investigation, Plaintiff ascertained that the scam emails being sent to individuals, including Plaintiff's customers, actually originated from Defendant Revboost.

9

51. Plaintiff also learned through its investigation that Defendant Revboost was using Plaintiff's email creative template, which included the Marquis Who's Who Marks, in unauthorized and unlawful attempts to phish for and mine customer data on behalf of Plaintiff's competitors, including but not limited to a website named "Exec Connector", located at Execconnector.com.

52. As a result, on or about October 27, 2022, Plaintiff had a phone call with Defendant Revboost in which Plaintiff required that Defendant Revboost comply with certain terms in order for Plaintiff's relationship with Defendant Revboost to continue (the "Terms Email"). A true and correct copy of the Terms Email is annexed hereto as **Exhibit "4"**. The items Plaintiff required of Defendant Revboost set forth in the Terms Email were the following:

> 1) Revboost will cease using creatives that use the Marquis and/or Who's Who in America Branding. You will only be authorized to use the Professional Who's Who creative.
>
> 2) Revboost will send us all creative assets on file for review/approval by EOD 10/28. No creative may be used without signed approval going forward.
>
> 3) Revboost will immediately stop using the creative used in the [S]nopes [A]rticle and will adhere to all requests made to change language in subject lines, etc.
>
> 4) Revboost will cease and desist using any of our creatives, logos or branding on any other client or partner's campaign.
>
> 5) Revboost will cease working with all imitators of the Who's Who concept. Especially, but not limited, to Exec Connector.
>
> 6) Revboost will fully adhere to all CAN-SPAM and other compliance standards including scrubbing of opt-outs from all files. (Last week you had 714 reported repeat opt-outs on a single send event- see attached).
>
> 7) Revboost will be fully transparent, honest and forthcoming with all issues or foreseen concerns regarding delivery, volume, quality, etc.
>
> 8) Revboost will take all necessary steps to ensure that Marquis campaigns are tested prior to send to ensure all links, etc are accurate and functioning properly.
>
> 9) Revboost will respond to all emails sent by any member of the Marquis team within 4 business hours.
>
> 10) Revboost may continue to fulfill 2000 cap this week, however, next week will cap at 1200.

11) Failure to comply will result in the loss of business and/ or monetary penalties. *See* Ex. 4.

53. On October 31, 2022, Plaintiff wrote Defendant Revboost an email due to an issue with thousands of repeat opt-outs, including customer complaints as a result of the same.

54. Plaintiff's record of individual email opt-outs is proprietary and confidential information to Plaintiff as it is required for Plaintiff to remain compliant with the law and to ascertain potential customers who no longer wish to be contacted via email.

55. Defendant Revboost repeatedly failed to comply with Plaintiff's requirements, including but not limited to: (1) the spam email issue, (2) the repeat opt-out issue as detailed hereinabove, and (3) Defendant Revboost's repeated failure to address same and adhere to Plaintiff's ongoing requirements of Defendant Revboost set forth in the Term Email. Plaintiff's relationship with Defendant Revboost was terminated as of November 8, 2022.

56. On January 25, 2023, an individual by the name of Jose Hernandez received an email that infringes on Plaintiff's Marquis Who's Who Marks (the "Infringing Mark"), and purportedly signed by "John Sartoris", who is an employee of Plaintiff (the "January 25 Spam Email"). A true and correct copy of the January 25 Spam Email is annexed hereto as **Exhibit "5"**. An individual by the name of Geanina Hernandez forwarded the January 25 Spam Email to Plaintiff to inquire as to whether it was spam. *See id.*

57. Plaintiff did not send the January 25 Spam Email.

58. The January 25 Spam Email contains the heading "Professional Who's Who", which infringes on the Marquis Who's Who Marks, and when clicked points to a website that also infringes on the Marquis Who's Who Marks and identifies Defendant Revboost as the source of the January 25 Spam Email. *See* Ex. 5 at p. 1.

59. Without Plaintiff's authorization, and upon information and belief, beginning after Plaintiff acquired protectable exclusive rights in its Marquis Who's Who Mark, Defendant Revboost adopted and began using Infringing Mark in U.S. commerce. *See id.*

60. The Infringing Mark adopted and used by Defendant is identical to Plaintiff's Marquis Who's Who Mark. *Compare* Ex. 1 at p. 5, 11, 21-22, 33, 42 *with* Ex. 5.

61. The January 25 Spam Email also contains language towards the bottom of the email identifying Plaintiff and containing a hyperlink that on its face is that of Plaintiff's but directs to a different website's application page. *See* Ex. 5 at p. 3.

62. The Terms and Conditions and Privacy Policy Link contained in the January 25 Spam Email also contain links to Plaintiff's Terms and Conditions and Privacy Policy. *See id.*

63. By the foregoing, the January 25 Spam Email makes clear that Defendant Revboost is sending emails to Plaintiff's customers and prospective customers as part of its efforts to mine their data to sell to Plaintiff's competitors.

64. Plaintiff has received many emails similar to the January 25 Spam Email from its customers notifying Plaintiff of their similar receipt of spam emails sent by Defendant Revboost that resemble or are otherwise identical to the January 25 Spam Email.

65. Plaintiff's records also reflect that Defendant Revboost has been repeatedly accessing Plaintiff's email opt-out information, which contains data on both Plaintiff's customers and the individuals who unsubscribed from Plaintiff's emails and is confidential and proprietary to Plaintiff.

66. Without Plaintiff's authorization, and upon information and belief, beginning after Plaintiff acquired protectable exclusive rights in its Marquis Who's Who Marks, Defendant

Revboost adopted and began using a mark identical to Plaintiff's Marquis Who's Who Marks (hereinafter the "Infringing Mark") in U.S. commerce.

67. Without Plaintiff's authorization, and upon information and belief, beginning after Plaintiff acquired protectable exclusive rights in its Marquis Who's Who Marks, Defendant Revboost adopted and began using the Marquis Who's Who Marks (hereinafter the "Infringing Mark") in U.S. commerce.

68. The Infringing Mark adopted and used by Defendant is identical and/or confusingly similar to Plaintiff's Marquis Who's Who Marks.

69. Upon information and belief, Defendant Revboost has been engaged in the distribution, advertising, promotion, and sale of targeted email marketing using the Infringing Mark throughout the United States.

70. Upon information and belief, the goods and services Defendant Revboost has marketed, advertised, and promoted under the Infringing Mark are biographical data and opportunities to individuals to be listed in their publications among other renowned individuals.

71. Upon information and belief, Defendant Revboost has marketed, advertised, and promoted goods and services under the Infringing Mark through email communication and the internet in the same manner and channels as Plaintiff.

72. Upon information and belief, Defendant Revboost offers and purports to sell goods and services under the Infringing Mark to individuals, including professionals and renowned individuals, which overlap with the consumers of goods and services offered by Plaintiff under the Marquis Who's Who Mark.

73. Upon information and belief, the goods and services Defendant Revboost offers under the Infringing Mark are of inferior quality as Defendant Revboost does not have a selection, vetting, or quality control processes as does Plaintiff.

74. Defendant Revboost's infringing acts as alleged herein have resulted in actual confusion as evidenced by, *inter alia*, the January 25 Spam Email.

75. Upon information and belief, Defendant Revboost's acts are willful with the deliberate intent to trade on the goodwill of Plaintiff's Marquis Who's Who Mark, cause confusion and deception in the marketplace, and divert potential sales of Plaintiff's goods and services to Defendant Revboost and/or Plaintiff's competitors to whom Defendant Revboost sells the information Defendant Revboost obtains by way of the Infringing Mark.

76. In addition to Defendant's unlawful infringement on Plaintiff's Marquis Who's Who Marks by its use of the Infringing Mark, and without Plaintiff's authorization, Defendant has used and is profiting from: (1) Plaintiff's confidential information and trade secrets including email opt-out information and customer data, and (2) the words and design of Plaintiff's emails to customers and potential customers.

77. Defendant Revboost's acts are causing and, unless restrained, will continue to cause damage and immediate irreparable harm to Plaintiff and to its valuable reputation and goodwill with the consuming public for which Plaintiff has no adequate remedy at law.

## IRREPARABLE HARM

78. Plaintiff will suffer irreparable harm if Defendant is not restrained and enjoined from continuing to use and disclose misappropriated trade secrets and from sending communications to Plaintiff's customers and potential customers infringing on Plaintiff's Marquis Who's Who trademarks.

79. Plaintiff has spent many years, substantial dollars, and vast resources to develop its Marquis Who's Who Marks and its confidential information, which includes email opt-out information and customer data. If Defendant is not restrained from continuing to use the Infringing Mark and continuing to use and disclose our email opt-out information and customer data, Marquis will be irreparably harmed.

80. Plaintiff business model depends on a high level of confidence from its customers in the confidential and discrete practices of Marquis, including maintaining confidential email opt-out information and customer data.

81. Further, Defendant's use of the Infringing Mark, as exemplified by the January 25 Spam Email, lessens confidence in Plaintiff wreaks havoc on the invaluable business relationships Plaintiff has with its customers and the general public.

82. If Defendant is not restrained from engaging in its tortious and harmful activities, further damage to Plaintiff's goodwill and business will be certain and incalculable.

83. On the other hand, the granting of injunctive relief will not harm Defendant as in no way can Defendant be permitted to use the Infringing Mark or to use or disclose Plaintiff's misappropriated trade secrets.

WHEREFORE, Plaintiff's Order to Show Cause should be granted in its entirety.

_____
KRISTINE MCCARTHY

Sworn to before me this
____ day of February, 2023

_____
NOTARY PUBLIC

CHRISTINE A IMRIE
Notary Public, State of New York
No. 01IM6203046
Qualified in Nassau County
Commission Expires 3/30/2025

15